Laura Blueford SKIPPER, Individually and as Temporary Administratrix of the Estate of Royletta L. Blueford, Deceased, Plaintiff–Appellee,

v.

UNITED STATES of America, Defendant–Appellant.

No. 92–8231.

United States Court of Appeals, Fifth Circuit.

Sept. 10, 1993.

Rehearing Denied Oct. 18, 1993.

John F. Paniszczyn, Asst. U.S. Atty., Ronald F. Ederer, U.S. Atty., San Antonio, TX, for defendant-appellant.

John B. Luscombe, Jr., El Paso, TX, for plaintiff-appellee.

Before REAVLEY, KING, and GARWOOD, Circuit Judges.

KING, Circuit Judge:

Royletta Blueford was shot and killed at the Non–Commissioned Officers Club at Biggs Army Airfield, Fort Bliss, Texas on July 8, 1984, by Charles Haywood, a former boyfriend. Blueford's mother, Laura Blueford Skipper, brought this action against the United States, alleging that the officer's club negligently served alcoholic beverages to Haywood when he was intoxicated and that

this negligence was a proximate cause of Blueford's death. The district court entered a judgment in favor of Skipper, and the United States appeals from that judgment. Finding that Haywood's actions were not foreseeable by the club, we reverse and render judgment in favor of the United States.

I

A

Blueford was introduced to Haywood in December 1983. They dated for several months and established an intimate relationship; in fact, Haywood proposed marriage. Blueford rejected Haywood's proposal of marriage, however, and sought to end their relationship. In June and July of 1984, Haywood began to harass Blueford. First, he telephoned Blueford and wrote her notes; he then followed her, monitoring her movements, and attempted to break into Blueford's apartment; ultimately, Haywood threatened physical violence, which included a threat to kill Blueford if she did not sleep with him. This pattern of harassment escalated to physical violence when, on July 4, 1984, Haywood forced his way into Blueford's apartment and raped her.

Although she did not report the rape, Blueford filed a formal complaint with the El Paso Police Department on July 6, 1984, stating that she was willing to prosecute Haywood for threatening her. Blueford specifically reported that Haywood threatened to "blow her away" if she did not sleep with him.[1] According to Patricia Aguilar, a close friend of Blueford, Blueford was terrified of Haywood during the first week of July. In fact, she considered moving away from El Paso, Texas but, instead, accepted an offer to stay at Aguilar's home. Even when she was staying at Aguilar's home, Haywood continued to harass Blueford. However, according to Aguilar, Aguilar's large German shepherd dog "encouraged" Haywood to leave.

Aguilar is the wife of a retired, non-commissioned officer, a status which entitles her to access the Non–Commissioned Officers Club (NCO Club) at Biggs Army Airfield, Fort Bliss, Texas. The NCO Club is located near the Sergeant Majors Academy, "Sergeant Major" being the highest rank attainable by a non-commissioned officer in the military. On Sunday, July 8, 1984, Blueford and Aguilar decided to go to the NCO Club; because the club is not open to the general public and is situated on a federal enclave surrounded by soldiers, they felt that Haywood would not attempt an altercation there. Moreover, prior to Blueford's murder, the NCO Club enjoyed a reputation as being a relatively quiet club. In fact, at trial, Sergeant Major Dillard testified that he had worked as the night manager at the NCO Club during the eighteen months prior to July 8, 1984 and that, during that time, he witnessed only one incident—a shoving match—involving any violence, and it did not involve a weapon. According to Dillard, that incident was broken up quickly and without the need for calling the military police.

Haywood was a cab driver. On the evening of Sunday, July 8, at approximately 10 p.m., Haywood delivered a fare to the NCO Club and recognized Aguilar's car in the parking area. Although the NCO Club is not open to the general public and Haywood was not the guest of any club member, Haywood entered the NCO Club; no one asked him for identification. Haywood carried a gun, purchased the day before, which he concealed beneath his shirt. Upon entering the NCO Club, Haywood went to the bar and had a few drinks. He then moved to a table. On several occasions, Haywood got up from his table, walked directly past—and within a foot of—Aguilar's and Blueford's table, left the NCO Club, re-entered, and then passed Aguilar and Blueford again. According to Aguilar, Haywood did this a least three or four times during a two-hour period. At least once during the evening, Haywood approached Blueford to speak with her, but she ignored him and Aguilar told him to leave their table. Aguilar then approached Haywood at his table and told him to forget about his relationship with Blueford and to leave the NCO Club. Haywood refused.

Haywood consumed drinks while sitting at the bar and while sitting at his table, and he

---

**1.** Haywood later admitted that he threatened to kill Blueford.

was served by at least three separate individuals—two bartenders and a waitress. He paid for his drinks in cash, thereby avoiding any tabulation of his overall alcohol consumption at the club. Haywood had been drinking alcohol prior to his arrival at the NCO Club and, while at the club, he consumed between seven and ten drinks containing alcohol.[2] Aguilar testified that she watched Haywood closely during the course of the evening because she learned the night before that he had raped Blueford just a few days earlier. According to Aguilar, Haywood showed no effects of drinking alcohol; specifically, she stated that he did not slur his speech, raise his voice, swagger when walking, or demonstrate any other indication that he was intoxicated. In fact, during the course of the evening, Haywood walked around the club, exited and re-entered, and had several conversations with an acquaintance, Amanda Mitchell. Aguilar also testified that there was no indication that Haywood was carrying a revolver. Aguilar's testimony was corroborated by that of Dillard, who accidentally bumped into Haywood in a crowded corridor just a few minutes before the shooting. According to Dillard, Haywood did not appear to be intoxicated and he seemed very civil. At no time did Aguilar or Blueford inform the NCO Club personnel that Haywood posed a threat or that they desired that he leave the club.[3] In fact, Aguilar testified that Haywood acted like a "perfect gentleman" throughout the evening. Haywood also testified that he had been a chronic but functional alcoholic since the age of nineteen; specifically, he testified that, despite the fact that he averaged a "fifth" of hard alcohol per day, he was able to function in the Army and as a taxi cab driver.

Blueford danced with several patrons during the course of the evening and, shortly before midnight, she got up to dance with another. While she was dancing, Haywood approached her, pulled out his revolver, grabbed her, twisted her towards him, and fired two shots into her chest at point-blank range. Haywood testified that he also shot at but missed Blueford's dancing partner. Haywood then picked Blueford up and, while doing this, pointed the gun at his own head and occasionally brandished the weapon; Haywood later testified that it was his intention to commit suicide or shoot any person who tried to stop him. Aguilar attempted to convince Haywood to release Blueford, but she backed away when Haywood told her that she "was next." After dragging Blueford out of the NCO Club, Haywood shot her two more times. He also shot himself once in the abdomen in an effort to commit suicide.

Blueford was rushed to the hospital, where she died early on the morning of July 9. Haywood, whose blood alcohol level was determined to be .15, did not suffer permanent injury to any internal organs from his self-inflicted gunshot wound. Prior to his discharge from the hospital, Haywood attempted suicide on two more occasions; one of these attempts involved an overdose of prescribed medications which left him in a coma for several days.

Haywood was found guilty of killing Blueford in the first degree pursuant to 18 U.S.C. § 1111,[4] and was sentenced to a thirty-year term of imprisonment for the crime. And it was revealed during these criminal proceedings that Haywood has a lengthy record of violent behavior, which is documented through his arrest history.

B

Skipper, individually and in her representative capacity as temporary administratrix

2. The parties dispute the number of drinks consumed by Haywood at the NCO Club, Skipper asserting that several of Haywood's drinks were doubles. According to the record, these "doubles" were, in accordance with the NCO Club's policy, two separate drinks served at once rather than a single, double-strength drink.

3. Haywood testified that he would have left the NCO Club if he had been asked by the club's personnel to do so.

4. Section 1111 provides that

[m]urder is the unlawful killing of a human being with malice aforethought. Every murder perpetrated by poison, lying in wait, or any other kind of willful, deliberate, malicious, and premeditated killing ..., or perpetrated from a premeditated design unlawfully and maliciously to effect the death of any human being other than him who is killed, is murder in the first degree.

of her daughter's estate, brought this action against the United States after her administrative claim against the United States Army was denied on March 1, 1988. The United States answered and filed a motion for summary judgment, which the district court granted in part and denied in part. Specifically, the court granted the United States summary judgment on Skipper's claims that the United States was negligent in allowing Haywood to enter the NCO Club and in allowing him to enter the club with a firearm. The court denied the United States's motion for summary judgment on Skipper's two other theories of recovery: (1) that the employees of the NCO Club were negligent in serving alcohol to Haywood when he was intoxicated; and (2) that the NCO Club personnel were negligent in failing to promptly respond after Haywood first shot Blueford.

Following a bench trial, the district court entered a judgment in favor of Skipper in March 1992, awarding her damages in her capacity as administratrix in the amount of $153,772.10. The court also awarded Skipper $110,000.00 in damages in her individual capacity. In its memorandum containing findings of fact and conclusions of law, the court held that the NCO Club personnel should have known that Haywood was intoxicated based upon the number of drinks he consumed during the time he was in the club. The court also found that Haywood probably would not have shot Blueford had he not been severely intoxicated. The United States now appeals from the district court's judgment in favor of Skipper.

## II

Skipper has brought this claim against the United States pursuant to the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 1346(b), 2674. Under the FTCA, the United States is liable in damages only if a private person would be liable for the same allegedly negligent act or omission under the laws of the state within which the act or omission occurred. 28 U.S.C. § 2674 ("The United States shall be liable ... in the same manner and to the same extent as a private individual under like circumstances...."); *see Richards v. United States*, 369 U.S. 1, 82 S.Ct.

585, 7 L.Ed.2d 492 (1962). Accordingly, Skipper's claim is governed by Texas' law on negligence.

Under Texas law, negligence consists of four essential elements: (1) a legal duty owed by the defendant to the plaintiff; (2) a breach of that duty; (3) actual injury to the plaintiff; and (4) a showing that the breach was a proximate cause of the injury. *See Urbach v. United States*, 869 F.2d 829, 831 (5th Cir.1989) (applying Texas law). Causation is a question of fact and, in a bench trial, it is reviewed under the clearly erroneous standard. *Id.* "There are two elements of proximate cause under Texas law: foreseeability and cause in fact." *Id.; see also Bykowicz v. Pulte Home Corp.*, 950 F.2d 1046, 1053–54 (5th Cir.) (applying Texas law), *cert. denied,* — U.S. —, 113 S.Ct. 73, 121 L.Ed.2d 38 (1992). In applying Texas law, this court has held that "[f]oreseeability requires that the injury complained of be of such a general character as *might reasonably have been anticipated* from the defendant's conduct." *Bykowicz,* 950 F.2d at 1054 (emphasis added). Similarly, the Supreme Court of Texas has held that:

> All that is required is that the injury be of such a general character as *might reasonably have been anticipated* and that the injured party be so situated with relation to the wrongful act that injury *might reasonably have been foreseen.*

*Brown v. Edwards Transfer Co.,* 764 S.W.2d 220, 224 (Tex.1989) (emphasis added). The Supreme Court of Texas has also stated that "[f]oreseeability does not require [that] the actor anticipate the particular accident, but only that he *reasonably anticipate the general character of the injury.*" *El Chico Corp. v. Poole,* 732 S.W.2d 306, 313 (Tex.1987) (emphasis added). Although a tortfeasor's negligence is not superseded when criminal conduct is a *foreseeable* result of that negligence, "[g]enerally, a person's criminal conduct is a superseding cause extinguishing liability of a negligent actor." *Id.* at 313–14; *Gutierrez v. Scripps–Howard,* 823 S.W.2d 696, 700 (Tex. App.—El Paso 1992, no writ).

In the case before us, the district court relied heavily upon the Texas Supreme Court's opinion in *El Chico,* 732 S.W.2d at

313. As explained in *Riojas v. Phillips Properties, Inc.*, 828 S.W.2d 18, 23 (Tex. App.—Corpus Christi 1991, no writ), before *El Chico*, Texas followed the common-law rule that a purveyor of alcoholic beverages was not liable for damages sustained by third persons resulting from a patron's intoxication. The *El Chico* court abolished this rule of non-liability, noting that a civil cause of action exists in forty-one of fifty American jurisdictions—including the District of Columbia and excluding Texas—with a substantial majority basing the cause of action upon the common-law principles of negligence, negligence per se, or both. *Riojas*, 828 S.W.2d at 23. Moreover, the *El Chico* court addressed the "dramshop" statute enacted by the Texas legislature the week before, Tex. Alco.Bev.Code Ann. § 2.02, which created a civil cause of action against an alcoholic beverage licensee when "at the time . . . [of service] . . . it was *apparent* to the provider that the individual being . . . served . . . was obviously intoxicated to the extent he presented a clear danger to himself and others." The court stated that "[t]he legislature appears to have created a much more onerous burden of proof for an injured plaintiff than we have in this opinion. This act, however, does not by its terms govern a cause of action arising or accruing before its effective date." 732 S.W.2d at 314.

The *El Chico* court concluded that an alcoholic beverage licensee could be liable to a person injured by an intoxicated[5] driver for selling alcohol to that intoxicated driver. The rationale underlying the decision is that, "[c]learly, a patron's criminal act is a foreseeable consequence in light of our universal use of automobiles and accidents involving drunk drivers." 732 S.W.2d at 314. Applying *El Chico* to the case at issue, the district court determined that "[t]he number of drinks served to Haywood, and the speed with which he consumed them, put the Defendant's bartenders on notice that he was intoxicated." The court then speculated that,

"[h]ad Haywood not become severely intoxicated, and had his judgment not been greatly impaired, it is highly improbable that he would have shot Ms. Blueford simply because he saw her dancing with a stranger." And the court concluded that "[t]he defendant's agents in the instant case could reasonably have foreseen that an injury or harm of this general nature was likely to occur, although it might have been vehicular homicide rather than a death by shooting."

■ In challenging the district court's findings, the government first questions the district court's retroactive application of *El Chico*. Although Haywood killed Blueford several years before *El Chico* was decided, *El Chico* has been applied retroactively under similar circumstances. *See Riojas*, 828 S.W.2d at 22–23. We find that the retroactive application of *El Chico* to the case before us is in accordance with "[t]he general rule . . . that a decision of the supreme court is retrospective in operation." *Id.* at 22, *citing Burns v. Thomas*, 786 S.W.2d 266, 267 n. 1 (Tex.1990); *Sanchez v. Schindler*, 651 S.W.2d 249, 254 (Tex.1983).

■ We do not agree, however, with the district court's determination that *El Chico* supports a finding that Haywood's first-degree murder of Blueford was foreseeable. Even if we assume arguendo that the alcohol the NCO Club served to Haywood was a cause-in-fact of Blueford's murder, we conclude that the premeditated murder of Blueford by Haywood at the NCO Club does not constitute an injury (such as the involuntary manslaughter at issue in *El Chico* ) "of such a general character as might reasonably have been anticipated [by the NCO Club] from [Haywood's] conduct." *Bykowicz*, 950 F.2d at 1054. Rather, we conclude that Haywood's criminal conduct constitutes an unforeseeable, superseding cause which extinguished any liability on the part of the NCO Club for Blueford's death. *See Gutierrez*, 823 S.W.2d at 700 ("Generally, a person's criminal conduct is a superseding cause ex-

---

5. As explained in *El Chico*,

Intoxication refers to a condition when, due to the consumption of alcoholic beverages, a person suffers impaired mental or physical facilities and a resulting diminution of the ability to think and act with ordinary care. *Thus the*

*duty to discontinue serving alcohol arises once, through the observation of a patron's demeanor, conduct or appearance, a licensee knows or should know the patron is intoxicated.*
732 S.W.2d at 313 (emphasis added).

**354**

tinguishing liability of a negligent actor."); *El Chico*, 732 S.W.2d at 313.[6]  We conclude, therefore, that the district court was clearly erroneous in finding that the NCO Club's personnel could have foreseen that Haywood would murder Blueford as a result of the alcohol he consumed at the club. Accordingly, we reverse the district court's judgment in favor of Skipper and render judgment in favor of the United States.

### III

For the foregoing reasons, we REVERSE the district court's judgment in favor of Skipper and RENDER judgment in favor of the United States.

---

**6.** Section 448 of the RESTATEMENT provides:

The act of a third person in committing an intentional tort or crime is a superseding cause of harm to another resulting therefrom, although the actor's negligent conduct created a situation which afforded an opportunity to the third person to commit such a tort or crime, unless the actor at the time of his negligent conduct realized or should have realized the likelihood that such a situation might be created, and that a third person might avail himself of the opportunity to commit such a tort or crime.

RESTATEMENT (SECOND) OF TORTS (1965 & Supp. 1992–93). Section 442 of the RESTATEMENT identifies the following considerations as being of importance in determining whether an intervening force constitutes a superseding cause of harm:

(a) the fact that its intervention brings about harm different in kind from that which would otherwise have resulted from the actor's negligence;

(b) the fact that its operation or the consequences thereof appear after the event to be extraordinary rather than normal in view of the circumstances existing at the time of its operation;

(c) the fact that the intervening force is operating independently of any situation created by the actor's negligence, or, on the other hand, is or is not a normal result of such a situation;

(d) the fact that the operation of the intervening force is due to a third person's act or to his failure to act;

(e) the fact that the intervening force is due to an act of a third person which is wrongful toward the other and as such subjects the third person to liability to him; [and]

(f) the degree of culpability of a wrongful act of a third person which sets the intervening force in motion.

*Id.* at § 442.